**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

UNITED STATES OF AMERICA,      )
                                 )
           v.                    )       Criminal Action No. 20-266 (RBW)
                                 )
JEROME WINECOFF,            )
                                 )
           Defendant.    )
_____)

## <u>MEMORANDUM OPINION</u>

This matter came before the Court on defendant Jerome Winecoff's Motion to Suppress

Evidence ("the defendant's motion" or "Def.'s Mot."), ECF No. 24.  Upon consideration of the

parties' submissions,[1] as well as the evidence and oral arguments presented at the hearings held

on October 14, 2021; October 18, 2021; and October 21, 2021, the Court, on December 1, 2021,

issued an oral ruling granting the defendant's motion.  <u>See</u> Order at 1 (Dec. 1, 2021), ECF No.

49.  In the subsequent Order of the Court memorializing that ruling, the Court indicated that it

would release this Memorandum Opinion to "explain[] the Court's rationale in full[.]"

<u>Id.</u> at 1 n.1.

## I.     BACKGROUND

### A.     Factual Background

On November 17, 2020, at approximately 4:00 p.m., Metropolitan Police Department

Seventh District Crime Suppression Team members were patrolling in the vicinity of the 200

---

[1] In addition to the filing already identified, the Court considered the following submissions in rendering its decision: (1) the Government's Opposition to the Defendant's Motion to Suppress Evidence ("Gov't's Opp'n"), ECF No. 25; (2) the parties' Stipulation, ECF No. 36; (3) the defendant's Supplemental Brief to Motion to Suppress Evidence ("Def.'s Suppl."), ECF No. 40; (4) the Government's Supplemental Brief in Opposition to the Defendant's Motion to Suppress Evidence ("Gov't's Suppl."), ECF No. 41; (5) the United States' Response to Defendant's Supplemental Brief to Motion to Suppress Evidence ("Gov't's Resp."), ECF No. 45; and (6) the defendant's Reply to Government's Opposition ("Def.'s Resp."), ECF No. 48.

block of Orange Street, Southeast, in the District of Columbia.  See Transcript of Motion

Hearing (Oct. 14, 2021) ("Oct. 14 Tr.") at 5–7, ECF No. 38.  The officers were patrolling in two

separate vehicles: an unmarked cruiser and a marked cruiser.  See Oct. 14 Tr. at 8:10–22.

Officer John Jeskie and three other officers rode in the first, unmarked cruiser, while "three to

four more officers" followed in the second marked cruiser as they entered the 200 block of

Orange Street, Southeast.  See id.  Officer Jeskie, who was fully dressed in his police uniform,

sat in the front passenger seat of the unmarked cruiser.  Id. at 10:18–11:3.  The driver of the

unmarked cruiser and the other officers in both cruisers also wore full and identifiable police

attire.  Id. at 11:4–6.  Officer Jeskie testified, based on his experiences and observations from

past patrols in that area, id. at 9:18–22, that "civilians often recognize [the] unmarked [cruiser] as

a police car[,]" id. at 9:20–21.

    According to Officer Jeskie, the neighborhood that he and his fellow officers were

patrolling "has a lot of firearm offenses within it, [and] a lot of violent crimes occur in that area."

Id. at 7:8–9.  Officer Jeskie specifically referenced a "crime trend that was happening in that area

with a lot more shootings[ and] a lot more gun recoveries[,]" id. at 7:10–8:4, as well as a recent

"drive-by shooting where numerous people were hit and one person died[,]" id. at 7:25–8:14.

    As the officers approached the area of 218 Orange Street, Southeast, Officer Jeskie

"observed an individual[—the defendant—]walking off the sidewalk[ and] stepping into the

street[.]"[2]  Id. at 15:1–3.  According to Officer Jeskie, the defendant "saw [the unmarked cruiser]

---

[2] The Court relies heavily on the referenced transcripts, which reflect that the government solicited testimony from a single witness: Officer Jeskie.  The Court's understanding of the facts is further informed by the body-worn camera footage offered as evidence by the government during the evidentiary hearing on the defendant's motion to suppress.  However, the officers' body-worn cameras failed to capture many of the most pertinent events in this case, including the conduct that initially drew the officers' attention to the defendant.  These omissions were due to the positioning of the officers' body-worn cameras, as well as a lack of accompanying audio for much of the relevant footage.  It was not until when the officers exited their vehicles that the body-worn camera footage provides a corroborating depiction of the events that transpired.

and noticed that through the windshield it was [filled with] police." Id. at 15:7–8.  According to

Officer Jeskie, the defendant's eyes widened, see Transcript of Motion Hearing (Oct. 18, 2021)

("Oct. 18 Tr.") at 3:22–4:4, ECF No. 37, and he "immediately turn[ed] and [went] back to the

sidewalk[,]" Oct. 14 Tr. at 15:3–4.  Officer Jeskie testified that the defendant "looked extremely

nervous."  Id. at 15:8–9.  Officer Jeskie then observed the defendant quickly walk behind a

"white van" parked on the street, id. at 15:4, and when Officer Jeskie gained sight of the

defendant again, the defendant was entering the front passenger seat of a maroon or burgundy

sport utility vehicle ("the burgundy SUV") parked immediately in front of the white van, see id.

at 17:20–21.  The defendant then appeared to confer with the individual seated in the front seat in

the burgundy SUV.  See id. at 17:22–24.

Officer Jeskie noted his observations to his fellow officers in the unmarked cruiser, and,

based on Officer Jeskie's observations, see Oct. 14 Tr. at 38:19–22, the operator of the unmarked

cruiser drove diagonally in front of the burgundy SUV's front left bumper before coming to a

stop, see id. at 38:25–39:1.  Based on the officers' body-worn camera footage, it appears that the

unmarked cruiser ultimately came to a stop between eight and twelve feet ahead of the burgundy

SUV.[3]  See Gov't's Suppl. at 5, Figure 2; Def.'s Suppl. at 7.  Because the unmarked cruiser

stopped diagonally in front of the burgundy SUV, the burgundy SUV's ability to maneuver past

the unmarked cruiser in a forward direction would have been extremely difficult, if not

impossible, to achieve.  Moreover, the marked cruiser, which had simultaneously been driven up

the street towards the left side of the white van, further constrained the burgundy SUV's ability

to move from its location.  See Gov't's Suppl. at 5 (Figure 2).

---

[3] The government asserts that the unmarked cruiser parked ten to twelve feet ahead of the burgundy SUV, see
Gov't's Suppl. at 16, but, based on the Court's review of the evidence, the Court finds that the distance could have
been as small as eight feet.

As the marked cruiser approached and began to slow down parallel to the white van, Officer Jeskie and the other officers exited their stopped unmarked cruiser and approached the burgundy SUV.  Oct. 14 Tr. at 23:24–24:11.  As Officer Jeskie exited the unmarked cruiser, he witnessed that "it [] seemed like [the defendant] was doing something with his hands below where [Officer Jeskie] could see[,]" Oct. 18 Tr. at 6:15–16, such that Officer Jeskie believed, based on his experience, were consistent with the defendant "trying to conceal a firearm or narcotics under the seat, in the glove box[,]" [4] id. at 6:16–20.  Officer Jeskie then walked to "the front passenger side of the burgundy SUV."  Oct. 14 Tr. at 18:15–16.  As he approached, Officer Jeskie witnessed the defendant engage in "continued movements around[,]" what Officer Jeskie presumed to be "the waist area[.]"  Id. at 18:19–20.  As Officer Jeskie arrived at the burgundy SUV's passenger door, another officer joined him on the passenger's side of the SUV, while the other officers from the unmarked cruiser approached the driver's side of the SUV.  See id. at 18:15–16, 19:12–17.

Upon Officer Jeskie's arrival at the front passenger door, he shined a flashlight on the defendant, see id. at 54:7–9, and the defendant, without being instructed, lifted his shirt to expose his waistband, see id. at 19:21–20:1.  According to Officer Jeskie, he then asked the defendant whether he had any weapons on his person, referring specifically to the defendant's "left pocket on his cargo pants on the left leg."  Id. at 20:13–22.  Officer Jeskie testified that he pointed specifically to the defendant's left pocket  when asking if the defendant had any weapons because he observed "[a] pretty raised object in [the defendant's] left cargo pocket that was

---

[4] The government contends that before the unmarked cruiser stopped, Officer Jeskie observed the defendant engage in these "furtive movements."  Gov't's Suppl. at 4.  However, Officer Jeskie later clarified in response to the Court's questioning prompted by the Court's confusion regarding the Officer's suggestion that he witnessed movements that he actually "couldn't see[,]" Oct. 14 Tr. at 18:6, that the earliest he witnessed these movements was when he was "panning over [his] right shoulder as [he] was exiting [his] vehicle."  Oct. 18 Tr. at 2:22–23 (emphasis added).

pretty tight within the pocket[,]" id. at 21:14–15, which appeared to be "a top slide of [a] firearm[,]" id. at 21:15–16.  Rather than responding as if he had been asked about his left pocket, see id. at 22:23–23:2 (reflecting Officer Jeskie's testimony that the video depicted the defendant "avoiding showing [the officers] what[ wa]s in his left pocket" and "dip[ping] down to something in the center console area or something"), the defendant responded as though he had been asked about his right side and, according to Officer Jeskie, "hunch[ed] over and br[ought] his left arm down over [his] left pocket[,]" id. at 21:3–4.  At least one of the other officers also asked the defendant about his left pocket.  See id. at 27:1 (reflecting Officer Jeskie's testimony that it "[s]ound[ed] like [the other officer] said left pocket").  Meanwhile, additional officers exited the now-stopped marked cruiser and joined their colleagues at the burgundy SUV.  See id. at 45:24–46:2.  Another officer—also suspecting that the defendant had a firearm in his left pocket—drew his police firearm.  See id. at 24:14–25, 25:4, 61:17–23.  The entire encounter, from the point Officer Jeskie exited the unmarked cruiser to when the officers began to focus their attention on the defendant's left pocket, lasted approximately eleven seconds.  See id. at 58:1–6.

Ultimately, the officers "t[ook], exit[ed] both" the defendant and the driver "out of the" burgundy SUV.  Id. at 25:10.  One of the officers patted-down the defendant's left pocket and communicated to the other officers their predetermined codeword for the presence of a firearm. See id. at 27:1–12.  The defendant then "began to resist."  Id. at 27:17.  During the ensuing struggle, the officers punched the defendant several times, see id. at 63:24–65:14, and Officer Jeskie "recovered the firearm from the [defendant's previously-mentioned] left pocket[.]" Id. at 27:19.  Following the recovery of the firearm, the defendant was "placed in handcuffs and arrested."  Id. at 32:9–11.

Subsequent to the arrest, the officers conducted a further search of the defendant's person.  See id. at 32:12–14.  In addition to the firearm, which Officer Jeskie later "discovered . . . was stolen . . . out of Alexandria, Virginia[,]" id. at 33:1–2, the officers recovered from the defendant's person an additional magazine of ammunition, see id. at 32:15–16.  "It was also discovered that [the defendant] was a felon . . . , which would render him unable to have a firearm legally."  Id. at 32:19–21.

## B.    Procedural History

On November 25, 2021, a grand jury issued an indictment charging the defendant with one count of unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year.  See Indictment at 1, ECF No. 6.  On June 8, 2021, the defendant filed his motion to suppress.  See generally Def.'s Mot.  Following an evidentiary hearing regarding the defendant's motion held on October 14, 2021; October 18, 2021; and October 21, 2021, the Court solicited supplemental briefing addressing, specifically, the timing of the applicable seizure of the defendant and the basis for the seizure. See generally Def.'s Suppl.; Gov't's Suppl.; Gov't's Resp.; Def.'s Resp.  On December 1, 2021, the Court issued an oral ruling granting the defendant's motion and indicated that it would, "release a Memorandum Opinion that explains the Court's rationale in full[.]"  Order at 1 n.1 (Dec. 1, 2021).

## II.    STANDARD OF REVIEW

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend. IV.  Because of this protection, "all seizures, even ones involving only a brief detention short of traditional arrest," must be "founded upon reasonable,

objective justification." United States v. Gross, 784 F.3d 784, 786 (D.C. Cir. 2015) (internal

quotations and citations omitted); see also United States v. Mendenhall, 446 U.S. 544, 551

(1980) ("The Fourth Amendment's requirement that searches and seizures be founded upon an

objective justification, governs all seizures of the person, including seizures that involve only a

brief detention short of traditional arrest.") (quotations and citations omitted). In moving to

suppress evidence for alleged Fourth Amendment violations, a defendant generally "has the

burden of establishing that his own Fourth Amendment rights were violated by the challenged

search or seizure." Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978) (citations omitted).

"However, '[w]hen a defendant establishes that he was arrested or subjected to a search without

a warrant,' as is undisputedly the case here, 'the burden then shifts to the government to justify

the warrantless search.'" United States v. Gibson, 366 F. Supp. 3d 14, 19–20 (D.D.C. 2018)

(alteration in original) (quoting United States v. Williams, 878 F. Supp. 2d 190, 197 (D.D.C.

2012)). In other words, "[b]ecause the [officers] in this case did not act pursuant to a warrant,

the government bears the burden of showing that [the officers'] interaction with [the defendant]

passes constitutional muster." United States v. Jones, 142 F. Supp. 3d 49, 56 (D.D.C. 2015).

### III.    ANALYSIS

The defendant requests that the "Court [ ] suppress the use, as evidence at trial, of all

tangible objects seized from him on November 17, 2020[.]" Def.'s Mot. at 2. Specifically, the

defendant argues that the firearm and ammunition recovered from his person "must be

suppressed as the fruit of [an] unlawful arrest . . . [because t]he government cannot meet its

burden to show that the officers' actions in this case were constitutional." Id. at 4. The

government responds that the officers acted lawfully because they "had reasonable articulable

suspicion to seize the defendant[,]" Gov't Opp'n at 8.

As the evidence and the parties' arguments show, this case, like many others "involving a brief encounter between a citizen and a police officer on a public street, is governed by the analysis [ ] first applied in Terry[ v. Ohio, 392 U.S. 1 (1968)]." Illinois v. Wardlow, 528 U.S. 119, 123 (2000).  Under Terry, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable[] articulable suspicion that criminal activity is afoot." Id. (citing Terry, 392 U.S. at 30).  Accordingly, the Court must address two central questions: (1) at what point was the defendant seized, i.e., stopped, and (2) whether, at the point of the seizure, the officers were justified in executing it.  See United States v. Delaney, 955 F.3d 1077, 1082 (D.C. Cir. 2020).  The Court will address each of these questions in turn.

## A.     The Timing of the Terry Stop

The Court's "first task is to pinpoint the time of the [Terry] stop." Id.  According to the defendant, he was seized under Terry "at the exact moment the [unmarked cruiser] stopped at an angle and blocked the front end of the" burgundy SUV.[5]  Def.'s Resp. at 1.  The government argues  in response that "no seizure occurred when the officers parked their [unmarked] cruiser [ten] to [twelve] feet ahead of the [burgundy] SUV[,]" because the SUV was not blocked, the marked cruiser only parked after the officers that were previously in the unmarked cruiser had already approached the burgundy SUV, and the defendant constrained his own movement by entering the vehicle of his own accord.  Gov't's Suppl. at 16.  Furthermore, the government contends that "[m]ore importantly, there is no evidence before the Court to suggest that a reasonable person in the defendant's circumstances would have 'kn[own] he was the focus of

---

[5] The defendant first insinuated that his argument here rested on both police cruisers coming to a stop, see Def.'s Suppl. at 1 (arguing that "[o]fficers seized [the defendant] when seven fully uniformed and armed police officers stopped two police cars in front of and behind" the burgundy SUV (emphasis added)), but later clarified that he believes the stop occurred once the unmarked cruiser stopped, see Def.'s Resp. at 1 (clarifying that, "[t]o the extent it is unclear, [the defendant] maintains that he was seized at the exact moment the [unmarked cruiser] stopped at an angle and blocked the front end of the" burgundy SUV and that, "[a]lthough the second police car certainly contributed and escalated the show of authority, it does not mark the beginning of [the defendant's] seizure").

police attention' by the time officers parked their [unmarked cruiser]." Id. at 16–17 (quoting Delaney, 955 F.3d at 1083).

"[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person[.]" Brown v. Texas, 443 U.S. 47, 50 (1979). Furthermore, a Fourth Amendment seizure occurs "when a person submits to an officer's 'show of authority.'" United States v. Brodie, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (quoting California v. Hodari, 499 U.S. 621, 626 (1991)). "Whether police action amounts to a 'show of authority' requires the court to ask whether a 'reasonable person' 'in view of all the circumstances surrounding the incident, . . . would have believed that he was not free to leave.'" United States v. Castle, 825 F.3d 625, 632 (D.C. Cir. 2016) (quoting United States v. Wood, 981 F.2d 536, 539 (D.C. Cir. 1992)).

> Factors considered in assessing whether an officer's actions amounted to a show of authority "include whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's 'use of language or tone of voice indicat[ed] that compliance with the officer's request might be compelled.'"

Id. (quoting Wood, 981 F.2d at 539 (alteration in original)).

The Court must first address whether the officers made a show of authority. Based on the evidence presented during the evidentiary hearing, the Court concludes that the officers made a show of authority sufficient to implicate Terry when the unmarked cruiser came to a stop diagonally in front of the burgundy SUV, which the defendant had recently entered. Although "the presence of a police car [by itself] is an insufficient show of authority to make a reasonable, innocent person feel unfree to leave[,]" United States v. Goddard, 491 F.3d 457, 461 (D.C. Cir. 2007), "'additional circumstances' beyond the mere 'presence of [the officers'] car' . . . 'would have communicated to a reasonable person' in [the defendant]'s position 'that he was not at

liberty to ignore the police presence and go about his business,'" Delaney, 955 F.3d at 1082

(quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)) (first alteration in original).  Here, the

police officers, according to the government, parked their car in a diagonal position roughly ten

feet from the front left bumper of the burgundy SUV.  See Oct. 14 Tr. at 38:25–39:1; Gov't's

Suppl. at 5, Figure 2; Def.'s Suppl. at 7.  While this distance is not as close as has been the case

in other similar cases, see, e.g., Delaney, 955 F.3d at 1082 (determining a stop began when, inter

alia, a police vehicle was parked approximately three feet from the subject vehicle), the

burgundy SUV would have still needed to "execute a number of turns to get out of [its] parking

[space,]" id. at 1083 (internal citations and original alterations omitted), if in fact that would have

been even possible.  In addition, although it was still moving at the time the unmarked cruiser

came to a stop, the marked police cruiser continued to approach the driver's side of the white van

that was parked directly behind the burgundy SUV, which created further constraint on the

burgundy SUV's ability to move.  See Gov't's Suppl. at 5 (figure 2).  Therefore, because

"blocking a vehicle can be the kind of application of physical force that constitutes a seizure[,]"

United States v. Johnson, 212 F.3d 1313, 1317 (D.C. Cir. 2000), and because the diagonal

positioning of the unmarked cruiser demonstrated that the officers did not want the burgundy

SUV nor its occupants to move, the overall positioning of both police cruisers at the time the

unmarked cruiser stopped in front of the burgundy SUV was "highly suggestive of a [Terry]

stop[,]" Delaney, 955 F.3d at 1083.

Furthermore, the Court finds that the defendant, based on his—albeit minimal—

interaction with the officers at the point when the unmarked cruiser stopped, would have

reasonably understood that the officers' focus was directed at him and he was "not at liberty to

ignore the police presence and go about his business."  See Bostick, 501 U.S. at 437.  The Court

disagrees with the government's assertion that "there is no evidence before the Court to suggest that a reasonable person in the defendant's circumstances would have 'kn[own] he was the focus of police attention' by the time [the] officers parked their [unmarked cruiser]."  Gov't Suppl. at 16–17 (quoting Delaney, 955 F.3d at 1083).  While the officers' focus did not manifest in more overt ways, such as with the use of a "take-down light[,]" see Delaney, 955 F.3d at 1083, Officer Jeskie's testimony regarding his initial eye contact with the defendant shows, whether the defendant was "innocent of any crime" or not, United States v. Lewis, 921 F.2d 1294, 1299 (D.C. Cir. 1990), that the defendant reasonably would have known that he was the subject of the officers' attention when they parked the unmarked cruiser in front of the burgundy SUV shortly after he had reason to believe that the officers had observed him just before he entered the burgundy SUV.  See Oct. 18 Tr. at 3:22–4:4, 15:3–4, 15:7–9.  Indeed, the government acknowledges that the defendant had "see[n the] fully uniformed officers in [the] unmarked [cruiser,]" just prior to the stop.  Gov't Suppl. at 22.

However, the Court agrees with the government that the presence of multiple officers in the unmarked cruiser, see Gov't Opp'n at 11–12, and the defendant's self-imposed constraint by entering the burgundy SUV's passenger seat, see id. at 12–13, are not conclusive in determining whether the defendant was stopped.  See, e.g., Lewis, 921 F.2d at 1299 (holding that a constraint on movement not arising from police conduct "does not create a seizure").  Nevertheless, the number of officers in the unmarked cruiser, the approach of the marked cruiser, and the defendant's constrained ability to walk away from the encounter due to his presence in the passenger seat of the targeted SUV are factors that inform the Court's "view of all the circumstances surrounding the incident."  Wood, 981 F.2d at 239.  Indeed, the pertinent question the Court must answer here is "whether the [defendant was] 'free to disregard the police

presence and go about his business.'" Lewis, 921 F.2d at 1299 (quoting Michigan v. Chesternut, 486 U.S. 567, 576 (1988)). Based on the evidence in this case, the answer is "no."

For these reasons, the Court must conclude that a show of authority sufficient to seize the defendant occurred when several officers in full police attire, see Oct. 14 Tr. at 11:4–6, after locking eyes with the defendant, see id. at 15:7–8; Oct. 18 Tr. at 3:22–4:4, parked their unmarked cruiser diagonally in front of the burgundy SUV, see Oct. 14 Tr. at 38:25–39:1, effectively blocking the burgundy SUV's ability to move. Furthermore, the defendant would have reasonably believed that this show of authority was plainly directed at him, even though it is conceivable that the officers could have been focusing on the driver, since he and the officers had just made eye contact with each other. See also United States v. Mabry, 997 F.3d 1239, 1244–45 (D.C. Cir. 2021) (concluding that officers' actions in stopping and patting down another individual near the defendant could constitute a "show of authority" indicating that compliance with officer directives was necessary and "a reasonable person in [the defendant]'s situation would not have felt free to leave").

Having determined that the officers made a show of authority sufficient to initiate a Terry stop, the Court must also conclude that the defendant submitted to that authority by remaining in the passenger seat of the burgundy SUV when the unmarked cruiser stopped in front of the burgundy SUV. See Delaney, 955 F.3d at 1084–85 ("[I]n response to the officers' show of authority, [the defendant] did not get up to run away but, instead, submitted by staying inside [of his vehicle.]" (internal quotation and alteration marks omitted)); see also Brendlin v. California, 551 U.S. 249, 250 (2007) (holding that, once a vehicle occupied by a passenger had stopped, the passenger signaled a submission to authority "by staying inside"). Accordingly, the defendant

was seized pursuant to <u>Terry</u> when the unmarked cruiser stopped in front of the vehicle where he was seated.

**B.      Reasonable Articulable Suspicion for the <u>Terry</u> Stop**

"With the timing of the seizure established, [the Court] turn[s] next to whether, at that point, the officers possessed 'specific and articulable facts' to 'support a reasonable and articulable suspicion that [the defendant wa]s engaged in criminal activity.'" <u>Delaney</u>, 955 F.3d at 1085 (quoting <u>Castle</u>, 825 F.3d at 634). "In determining whether [ ] officer[s] had reasonable suspicion for a <u>Terry</u> stop, [the C]ourt gives weight not to [the] officer[s'] 'inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which [they are] entitled to draw from the facts in light of [their] experience.'" <u>United States v. Hood</u>, 435 F. Supp. 3d 1, 6 (D.D.C. 2020) (quoting <u>Terry</u>, 392 U.S. at 27).

In support of its position that the officers possessed reasonable articulable suspicion prior to the stop, the government relies on the defendant's presence "in a high-crime area[,]" his nervous reaction to the officers' approach, namely, that his "eyes widened[,]" his "abrupt about-face" by suddenly deviating from entering the street and returning to the sidewalk, and his purported evasion by "darting behind [the] white van before quickly ducking into [the burgundy] SUV parked ahead of the van." Gov't's Suppl. at 22. In other words, the government asserts two basic circumstances: (1) the high-crime area in which the events occurred and (2) the defendant's reactions to the presence of police, including his movement back towards the sidewalk, behind the white van, and into the burgundy SUV, which the officers interpreted as nervousness. The Court will first address the purported high-crime area factor, followed by the defendant's reactions.

The evidence presented by the government supports its position that the interaction between the officers and the defendant took place in a "high-crime area" for the purposes of the Court's Fourth Amendment analysis.  See Wardlow, 528 U.S. at 124 (citing Adams v. Williams, 407 U.S. 143, 144, 147–48 (1972)) ("[T]he fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a Terry analysis.").  Officer Jeskie testified that he was "familiar with the neighborhood surrounding 218 Orange Street, Southeast[,]" Oct. 14 Tr. at 7:4–6, and that the neighborhood was suffering from "a lot of firearm offenses . . . [and] violent crimes[.]"  Id. at 7:8–9.  Officer Jeskie further indicated that "[n]umerous" illegal weapons have been recently recovered in the area, id. at 7:13, and, around November 17, 2020, he was aware of a "drive-by shooting" that had recently occurred in that block, id. at 7:21–8:4.

The defendant argues that "[t]he concept of a 'high-crime neighborhood' in the context of the Terry analysis has become virtually devoid of utility and should not factor into the Court's findings[.]" Def.'s Suppl. at 17.  But the fact that events occurred in a high-crime area is relevant to the Court's reasonable articulable suspicion analysis when combined with other circumstances.  See Wardlow, 528 U.S. at 124–25; see also id. at 124 ("[T]he fact that [a] stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis.")  As the District of Columbia Circuit has recognized, "the high[-]crime nature of the neighborhood[ ]is not unimportant[,]" but "it is only a 'contextual consideration[ ]' and, as such, cannot provide the kind of information . . . that is necessary to demonstrate reasonable suspicion." Castle, 825 F.3d at 636.  Indeed, presence in a high-crime area combined with evasive "headlong flight" would be sufficient for the Court to find reasonable articulable suspicion.  See id. at 636–37.  The defendant's contrary position would have merit if the only circumstance supporting the government's reasonable articulable suspicion analysis was based

on the events having occurred in a high-crime area.  See United States v. Edmonds, 240 F.3d 55,

60 (D.C. Cir. 2001) ("[T]he fact that a given locale is well known for criminal activity will not

by itself justify a Terry stop; but it is among the various factors that officers may take into

account." (emphasis in original)); see also Maryland v. Buie, 494 U.S. 325 , 334 n.2 (1990)

("Even in high crime areas, where the possibility that any given individual is armed is

significant, Terry requires reasonable, individualized suspicion.").

 Even though this case is not that situation, the government has nonetheless failed to

sufficiently establish additional circumstances that would permit the Court to conclude that the

officers possessed reasonable articulable suspicion that the defendant was engaged in criminal

activity at the point of the Terry stop.  Specifically, the government's evidence of the defendant's

nervous behavior—which comprised of his "nervous reaction, including [becoming] wide

eye[d]" upon seeing the officers; taking an "abrupt about face away from the officers" after

stepping into the street after seeing the officers; "quickly" moving behind the white van and then

immediately entering the burgundy SUV when he reached the other side of the white van; the

defendant's "focus[ed] [] attention on the" unmarked cruiser as it pulled parallel to the burgundy

SUV; and engaging in "frantic" conversation with the burgundy SUV's driver, Gov't's Suppl. at

10—fail to satisfy the government's burden.  While this evidence demonstrates that it was

understandable for the defendant's activity to attract the officers' attention, it does not amount to

the kind of "specific and articulable facts" necessary to "support a reasonable and articulable

suspicion that [the defendant wa]s engaged in criminal activity."  See Castle, 825 F.3d at 634.

"'[N]ervous, evasive behavior is,' of course, 'a pertinent factor in determining reasonable

suspicion.'"  Delaney, 955 F.3d at 1087 (alteration in original) (quoting Wardlow, 528 U.S. at

124).  However, "not all reactions to seeing the police are suggestive of criminal behavior."  Id.

(citing United States v. Jones, 584 F.3d 1083, 1087 (D.C. Cir. 2009) ("Merely walking away, even quickly . . . , upon the arrival of the uniformed police officer would not provide articulable suspicion of criminal wrongdoing.")).  Here, the situation is not just that "there are innocent reasons" to explain the defendant's behavior.  See Wardlow, 528 U.S. at 125.  Beyond mere "susceptib[ility to] an innocent explanation[,]" the government's evidence does not establish that the officers witnessed "conduct [that] was by itself lawful, but [that] also suggested that the [defendant]" was engaged in some kind of unlawful activity.  See id.

Accordingly, the Court cannot conclude that the defendant's reactions and movements, including his quick movement behind the white van and subsequent entry into the burgundy SUV, amount to "[h]eadlong flight"—"the consummate act of evasion[.]"  Wardlow, 528 U.S. at 124.  This level of evasion when combined with the events occurring in a high-crime area admittedly aid the government's attempts to establish the officers' purported reasonable articulable suspicion.  See id. at 125.  However, the facts in this case are not unlike those in United States v. Alvin, 701 F.App'x 151 (3d. Cir. 2017), where the Third Circuit rejected a similar reasonable articulable suspicion argument.  Specifically, the Third Circuit concluded that exiting a car and ducking behind it in response to police presence in a high-crime area did not support a reasonable articulable suspicion determination.  Id. at 154–55.  As the Third Circuit explained:

> [c]learly, "not every slouch, crouch, or other supposedly furtive movement[6] justifies a stop."  [United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000).]  This

---

[6] The government also asserts that "as the [unmarked cruiser] . . . pulled forward, [Officer Jeskie] observed the defendant focusing his attention on [the officers'] vehicle, frantically speaking with the driver of the SUV, and making furtive movements with his hands below where [Officer Jeskie] could see."  Gov't's Suppl. at 22 (emphasis added).  Generally, allegations of "furtive gestures in the presence of officers," Delaney, 955 F.3d at 1087, in tandem with a defendant's nervous behavior and events taking place in a high-crime area, may be sufficient to establish reasonable articulable suspicion.  See, e.g., id. (refusing to conclude officers had a reasonable articulable suspicion despite the defendant's proximity to recent gunshots because the defendant's suspicious movements that the officers identified were non-furtive, albeit "odd"); Castle, 825 F.3d at 629 (indicating that "furtive gestures are

(continued . . .)

may be especially true in proverbial "high-crime" areas, where residents may simply want to avoid encounters with police for reasons unrelated to any criminal conduct on their part. . . .

We realize, of course, that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." [Wardlow, 528 U.S. at 124.] We nevertheless resist the implicit invitation to elevate nervousness—or even an isolated evasive act—to the level that would allow police to detain anyone whom they conclude is nervous or trying to avoid them as they approach. Moreover, even if [the defendant] did appear nervous[,] . . . "[i]t is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer." [United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997).]

Id. at 155 (footnotes omitted). The Court is particularly sensitive to the Third Circuit's observations, even though it must avoid an "excessively technical dissection of the factors supporting" reasonable articulable suspicion and "consider the whole picture," District of Columbia v. Wesby, __ U.S. __, __, 138 S. Ct. 577, 588 (2018) (internal quotation marks omitted), because, as the defendant correctly indicates, the whole picture in this case involves "'little doubt that uneven policing may reasonably affect the reaction of certain individuals' when confronted by law enforcement." Def.'s Suppl. at 9 (quoting United States v. Brown, 925 F.3d 1150, 1156 (9th Cir. 2019)).

Indeed, resolving the defendant's motion has posed a significant challenge for the Court—a challenge created by the current state of Fourth Amendment Terry jurisprudence. Case authority acknowledges that individuals in high-crime areas disproportionately have negative

---

(. . . continued)

significant [ ] if they were undertaken in response to police presence" (internal quotation marks omitted)); Edmonds, 240 F.3d at 60–62 (holding there was reasonable articulable suspicion where, in a high crime area, police witnessed individuals in a car parked after-hours at a school who were engaging in "furtive" gestures, including "reaching under the driver's seat as though attempting to conceal something."); United States v. Tuten, 293 F. Supp. 2d 30, 32 (D.D.C. 2003) (holding that "officers had ample reason to initiate an investigatory stop of the defendant because . . . [t]he defendant was located in a high-crime area, made 'furtive' gestures . . . , and fled 'aggressively' in response to the police presence). However, as the Court previously indicated, Officer Jeskie clarified that he witnessed the probative "furtive mo[ve]ments" when he was "panning over [his] right shoulder as [he] was exiting the [unmarked cruiser,]" Oct. 18 Tr. at 2:15–23. Therefore, Officer Jeskie observed these gestures after the unmarked cruiser had already stopped and the defendant was seized under Terry. See id. Accordingly, the Court cannot consider them in analyzing whether the officers possessed sufficient reasonable articulable suspicion to initiate the Terry stop.

encounters with the police and, therefore, have greater reason to distrust law enforcement officials and may justifiably exhibit fear when encountering police officers and attempt to avoid such encounters.  See, e.g., Wardlow, 528 U.S. at 132 (Stevens, J., concurring in part) ("Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence."); Hood, 435 F. Supp. 3d at 8 (concluding that a defendant's "decision to put his hands up unsolicited [was] hardly surprising" due to how "the [Metropolitan Police Department Gun Recovery Unit] operates in [high-crime] neighborhoods . . . —i.e., essentially as a 'rolling roadblock' trawling the streets and asking to see individual's waistbands." (internal citation omitted)); see also Goddard, 491 F.3d 457, 468 (D.C. Cir. 2007) (Brown, J., dissenting) (positing that "inappropriate use of Terry in [ ] minority neighborhoods offends the principle of equal justice under law[]" and "excessive Terry searches set poor black communities and the police on opposing sides of pitched battle").  Based on this reality, authorities diverge on what actions by individuals in high-crime areas merit a legally permissible Terry stop.  On the one hand, if after observing the police a person breaks out in headlong flight away from them, an investigative stop by the police has been sanctioned.  See Wardlow, 528 U.S. at 124–25; United States v. Stubblefield, 820 F.3d 445, 451 (D.C. Cir. 2016); United States v. Bridges, 382 F. Supp. 3d 62, 68 (D.D.C. 2019); but see Brown, 925 F.3d 1150, 1156 (9th Cir. 2019) ("Given that racial dynamics in our society—along with a simple desire not to interact with police—offer an 'innocent' explanation of flight, when every other fact posited by the government weighs so weakly in support of reasonable suspicion, we are particularly hesitant to allow flight to carry the day in authorizing a stop.").  On the other hand, if a person ignores an

attempt by an officer to question the person or simply walks away from the officer, stops of the person by the police have been condemned.  See, e.g., Jones, 584 F.3d at 1087 ("Merely walking away, even quickly as appellant did, upon the arrival of the uniformed police officer would not provide articulable suspicion of criminal wrongdoing[.]"); United States v. Veney, 444 F. Supp. 3d 56, 66 n.6 (D.D.C. 2020) (declining to consider a defendant's decision to "simply walk away from" an officer in analyzing the existence of reasonable articulable suspicion); United States v. Devaugh, 422 F. Supp. 3d 104, 111 (D.D.C. 2019) (finding that a defendant "'walk[ing] to his vehicle' after being informed by [a] passerby of police presence in the area" was "not particularly inculpatory[]"); see also United States v. Wilson, 953 F.2d 116, 121 (4th Cir. 1991) (analyzing "the effect of a person's unsuccessful attempt to terminate what began as a consensual encounter").

The facts of this case fall somewhere in the middle of these two lines of cases, making the suppression decision here difficult.  However, the events that characterize this case are more consistent with those cases where the person did not actually run from the police.  Although the defendant did not run from the officers, he did seek to avoid interacting with them.  And while he arguably sought to conceal himself from the officers by entering the burgundy SUV, he remained in an upright seated position—remaining visible to the officers.  Ultimately, it cannot be concluded that the defendant engaged in the kind of evasion sufficient to justify a Terry stop under such circumstances.

Officer Jeskie and his fellow officers' intentions to address the rise of gun violence in the location where the events in this case occurred are commendable and necessary.  Indeed, easy accessibility to guns and gun violence are diminishing the quality of life in all too many communities in the United States, and that is especially the case in neighborhoods like the one

around the 200 block of Orange Street, Southeast.  But this unfortunate reality cannot supply the basis for diminishing the Fourth Amendment protections afforded to all persons within the borders of the United States, regardless of where they live or frequent.  To side with the government on the facts of this case would do just that.

In sum, although the events in this case occurred in a high-crime area, the Court must conclude that "the [g]overnment [has] failed to carry its burden of demonstrating that the actions of [the defendant] on the [afternoon] in question amounted to 'concrete factors' or 'objective indications' that he had just committed or was about to commit a criminal offense[,]" Castle, 825 F.3d at 630, because, instead, the government has only presented the kind of "inchoate and unparticularized suspicion[s] or hunch[es]" that cannot satisfy Terry's reasonable articulable suspicion inquiry.  See Terry, 392 U.S. at 27.

## IV.    CONCLUSION

Having concluded that the government has not carried its burden to establish that the officers possessed reasonable articulable suspicion that the defendant was engaged in criminal activity when the unmarked cruiser stopped in front of the burgundy SUV, the Court must also conclude that the defendant was seized in violation of the Fourth Amendment.  And, "when the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure."  United States v. Dolberry, Crim. Action No. 15-0037 (BAH), 2015 WL 4751023 at *2 (D.D.C. Aug. 11, 2015) (citing Wong Sun v. United States, 371 U.S. 471, 484 (1963); United States v. Matthews, 753 F.3d 1321, 1324 (D.C. Cir. 2014) ("The admissibility of all the incriminating evidence . . . depends upon the validity of the search.")).  Accordingly, the Court must grant the defendant's motion and suppress the physical

evidence recovered in this case, namely, the firearm and ammunition recovered from the defendant's person.

  **SO ORDERED** this 30th day of December, 2022.[7]

REGGIE B. WALTON
United States District Judge

---

[7] As the Court previously indicated, on December 1, 2021, the Court issued an Order consistent with this Memorandum Opinion.  See Order at 1 (Dec. 1, 2021).